697 F.2d 402
 225 U.S.App.D.C. 160
 TELE-MEDIA CORPORATION, Tele-Media Company of Key West, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Board of County Commissioners, Monroe County, Florida,
American Broadcasting Companies, Inc., Intervenors.
 No. 79-1820.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 21, 1982.
Decided Jan. 7, 1983.
As Amended Jan. 7, 1983.
 
 Stuart F. Feldstein, Washington, D.C., with whom Aaron I. Fleischman and David C. Jatlow, Washington, D.C., were on the brief, for appellants.
 Gregory M. Christopher, Atty., F.C.C., Washington, D.C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, C. Grey Pash, Jr., and Lisa B. Margolis, Attys., F.C.C., Washington, D.C., were on the brief, for appellee.
 Eugene F. Mullin, Jr., Washington, D.C., with whom Nathaniel F. Emmons and Howard M. Weiss, Washington, D.C., were on the brief, for intervenor, Bd. of County Com'rs of Monroe County, Fla.
 James A. McKenna, Jr., Thomas N. Frohock and R. Michael Senkowski, Washington, D.C., were on the brief for intervenor, American Broadcasting Companies, Inc.
 Frederick E. Attaway, Washington, D.C., was on the statement in lieu of brief for amicus curiae, Motion Picture Ass'n of America, Inc.
 Before EDWARDS, Circuit Judge, DAVIS*, Circuit Judge for the United States Court of Appeals for the Federal Circuit, and McGOWAN, Senior Circuit Judge.
 Opinion for the court filed by Senior Circuit Judge McGOWAN.
 McGOWAN, Senior Circuit Judge:
 
 
 1
 Petitioners Tele-Media Corporation[1] and Tele-Media Company of Key West[2] ("Tele-Media" or "company") seek review of a decision of the Federal Communications Commission ("FCC" or "Commission") dismissing their petitions to deny the applications for translator station construction permits filed by the Board of County Commissioners of Monroe County, Florida ("County").
 
 
 2
 In January, 1977, the County submitted applications to the FCC to construct and operate a number of UHF television translators in order to rebroadcast the signals of five Miami, Florida, television stations. Tele-Media asked the Commission to deny the County's applications outright or to designate them for an evidentiary hearing pursuant to section 309(e) of the Communications Act of 1934, as amended, 47 U.S.C. Sec. 309(e). Tele-Media contended that the FCC was required to hold such a hearing because Tele-Media, an existing cable operator in the area, had provided substantial evidence that the licensing of the County's translator system would cause economic injury to the company and that injury would redound to the public detriment. The company also argued that the County had not obtained the retransmission broadcast consent required by 47 U.S.C. Sec. 325(a), lacked the funds required to construct and operate the proposed system, and had not shown a need for the translator project. Finally, the company argued that the applications should not be acted upon until the conclusion of a pending FCC rulemaking proceeding.[3] Without conducting an evidentiary hearing, the FCC unconditionally granted the County's applications. Board of County Commissioners, Monroe County, Florida, 72 F.C.C.2d 683 (1979). Because we find that the company has raised no specific and material questions of fact that would warrant remand for the requested hearing, and because we find that the Commission correctly concluded that grant of the County's applications is in the public interest, we affirm the Commission's order in all respects.
 
 
 3
 * Monroe County, Florida, is located at the southern tip of the state, and the inhabited portion consists almost entirely of the Florida Keys, a series of small islands stretching from the southern tip of mainland Florida southward for more than 100 miles into the Gulf of Mexico. There are no broadcast television stations presently licensed to any community in the County. The nearest broadcast market is Miami, Florida. The Keys are 40 miles from Miami at their nearest point and some 150 miles at their farthest point. Because of their physical remoteness from Miami,[4] the Keys have never had satisfactory off-the-air television reception.[5]
 
 
 4
 This circumstance led the State of Florida and the County to grant a franchise in 1965 to a private cable television (CATV) company, Cable-Vision, Inc., to furnish cable television service to all the Keys.[6] Under the terms of the franchise, Cable-Vision was granted an exclusive, 30-year right to furnish cable service to the entire county. J.A. 292. Cable-Vision, however, did not embark on an ambitious plan of expansion. Although it was authorized to serve the entire county, it only provided service to Key West and to the Marathon area in the central portion of the Keys. The remainder of the county was left without any service. Moreover, the CATV system only carried the three Miami national network stations.[7] Id.
 
 
 5
 The 30-year exclusivity provision effectively barred the County from developing improved service by franchising a competing CATV company. Accordingly, in response to strong public demand, the elected Board of County Commissioners in 1973 unanimously adopted an ordinance authorizing applications to the FCC for UHF television translator stations to be operated by the County. J.A. 292-93. A television translator is a broadcast station, operating at relatively low power, that receives a television signal from a distant location on its original broadcast channel, amplifies it, and retransmits it to the general public on another channel.[8] The ordinance recited that the purpose of the translator system was to rectify "the unsatisfactory conditions existing in the reception of direct television signals now available to the public in [the] County."[9] J.A. 386.
 
 
 6
 The filing of the translator applications, however, was delayed because the County was forced into litigation by Cable-Vision's challenge to the County's right to operate the proposed translators. J.A. 293.[10] In 1976, while that litigation was pending, the cable system was sold to Tele-Media Corporation.[11] Id. At that time, the CATV system served only two communities and had a five-channel capacity. J.A. 164. Tele-Media commenced expansion of its system, which included the construction of new cable plants in Key Largo and Matecumbe and a twenty-channel system with two-way capacity in Big Pine.[12] J.A. 164-65.
 
 
 7
 On January 13, 1977, the County filed with the Commission its applications for construction permits for the translators.[13] Petitions to deny the applications were filed by Tele-Media, raising five substantive objections to the proposal. It argued that these objections required the Commission to deny the applications outright or to designate them for hearing pursuant to section 309(e) of the Communications Act, 47 U.S.C. Sec. 309(e). J.A. 81-161, 162-283.
 
 
 8
 First, it asserted that the competition offered by the County's translators would result in the elimination of local programming originated by Tele-Media and would ultimately bankrupt the CATV system.[14] Tele-Media argued that our decision in Carroll Broadcasting Co. v. FCC, 258 F.2d 440 (D.C.Cir.1958), compelled the FCC to hold an evidentiary hearing in this case. In Carroll, the court's focus was directed toward projected competition between an existing broadcast licensee and an applicant for a new broadcast station. We were concerned about protecting the public interest in those instances where an additional broadcast station in the market would have such a severe economic impact on an existing broadcast station as to compel it to reduce or discontinue its public service programming, programming that would not be replaced by the new entrant. The court ruled that "when an existing licensee offers to prove that the economic effect of another station would be detrimental to the public interest, the Commission should afford an opportunity for presentation of such proof and, if the evidence is substantial ..., should make a finding or findings." 258 F.2d at 443. While Tele-Media recognized that the Carroll decision involved competition between an existing broadcasting station and a potential broadcast licensee, J.A. 200, it asserted that the doctrine should apply to existing cable systems threatened by broadcasting services, J.A. 201. Because the company contended that it had "more than [met] the requisite Carroll tests," J.A. 205, it claimed that a hearing on the Carroll issue was required.
 
 
 9
 Second, the company asserted that the County had not obtained from the five Miami stations adequate consent to rebroadcast their signals as required by section 325(a) of the Communications Act, 47 U.S.C. Sec. 325(a). J.A. 84. Tele-Media argued that the language of the statute, as interpreted by the Commission and the courts, required program-by-program consent of each licensee whose programs were to be rebroadcast. J.A. 84. The County had only obtained blanket consents from the originating stations and the networks that were contingent on obtaining approval of the copyright owners, and had not yet negotiated agreements with program syndicators.
 
 
 10
 Third, petitioner alleged that the County lacked the financial qualifications to construct and operate the proposed facilities;[15] and, fourth, Tele-Media argued that the County had not shown a need for the translators. Section 74.732(b) of the Commission rules provided that applications for more than one translator, whether or not serving the same area, could only be granted "upon an appropriate showing of need for such additional stations." 47 C.F.R. Sec. 74.732(b) (1977). The company asserted that the County based its entire showing of "need" on the lack of free off-the-air television service in Monroe County. This showing, it was said, might be sufficient to justify the need for translators per se, but it did not address the need for one governmental entity to own and operate 25 translators in the same area.
 
 
 11
 Lastly, the petitioner claimed that this matter presented a compelling case for the FCC to hold the County's applications in abeyance. The FCC had begun an inquiry to reexamine its translator policies. It proposed to hold in abeyance pending translator applications that involved "novel features touching upon matters being considered" in the inquiry. Notice of Inquiry, supra note 3, at 1535; see also Low-Power TV Rules, 45 Fed.Reg. 69,178 (1980) (notice of proposed rulemaking); id., 47 Fed.Reg. 21,468 (1982) (final rules). The company requested the Commission to hold the County's applications in abeyance because the issues raised by the applications were said to be identical to those treated in the inquiry.[16]
 
 
 12
 After reviewing the entire record, the Commission granted the County's applications and dismissed the cable company's petition to deny. The Commission was not persuaded by the contention that the grant of the applications would be contrary to the public interest because it would result in a loss of local programming that would not be replaced. That argument, observed the Commission, was "an effort to raise a so-called Carroll issue." 72 F.C.C.2d at 686. The Commission indicated that the court's concern in Carroll was "whether an additional broadcast station in the market would have such a severe economic impact on existing broadcast services as to result in a net loss of public affairs programming to the public." Id. (emphasis in original). The Commission determined that the Carroll doctrine could only be applicable to public affairs programming by broadcast services:
 
 
 13
 The public affairs program[s] that are the Court's concern in Carroll are those that broadcasters develop and fashion to meet community needs and problems after an exhaustive ascertainment procedure that is reviewed by the Commission. These programs, the very heart of broadcasters' public interest obligations, are mandatory and subject to our review every three years.
 
 
 14
 Id. at 686-87. Because cable systems are not subject to the same sort of Commission scrutiny and may discontinue their local-origination programming at any time, the Commission concluded that the Carroll doctrine could not be applicable to the threatened translator competition to the existing CATV system. Id. at 687. The Commission noted in addition that the residents of Monroe County "should be given the option to choose between cable television and broadcast services." Id. at 686.
 
 
 15
 The Commission also disallowed the remainder of the company's contentions. After considering the claim that the County was required to obtain the consent of each program owner on a program-by-program basis as a prerequisite to obtaining a construction permit, the Commission ruled that such a requirement "would effectively read into the Act a requirement not imposed by Congress." Id. at 689. The Commission noted that the County had obtained the rebroadcast consent from each affected station and from the supplier networks before it had applied for the construction permits. The County's financial statement was found to be a sufficient guarantee of committed funds. Id. at 688. The FCC turned aside as well the company's contention that the County had failed to make a showing of need for the translators. Established Commission policy did not require "an applicant ... to show a need for translators, unless an objecting party first makes a prima facie showing of lack of need," and it concluded that the company's allegations that the translator would duplicate the service already provided by a cable system was inadequate, "as the need for the proposed translators in Monroe County is abundantly clear." Id. at 687.
 
 
 16
 Finally, the Commission denied the company's request to hold the matter in abeyance pending the outcome of the translator rulemaking. The Commission noted that the Notice of Inquiry specified that authorization of routine new television translators would not be delayed under the existing regulatory plan. Because the County's applications were "routine" and met existing regulatory requirements, abeyance was inappropriate. Id. at 693.
 
 
 17
 Tele-Media filed a timely petition for review of the Commission decision. The County and American Broadcasting Companies, Inc., sought and were granted intervention.
 
 II
 A. The Applicable Standard
 
 18
 We approach Tele-Media's challenge to the Commission's decision with the knowledge that the "scope of our review is quite narrow"[17] because "Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible, and we [should] ordinarily defer to that purpose."[18]
 
 
 19
 Under section 309(d) of the Communications Act of 1934, 47 U.S.C. Sec. 309(d), the Commission, after consideration of the pleadings and other matters that it may officially notice, is required to grant license applications that fail to raise "substantial and material questions of fact," if the license would serve the "public interest, convenience, and necessity." If a substantial and material question of fact is raised or if for any reason the Commission cannot make a finding that the grant of an application will serve the public interest, section 309(e), 47 U.S.C. Sec. 309(e), requires that the application be designated for hearing. Under the statutory scheme, any party in interest may file a petition to deny a pending application. This petition, however, must "contain specific allegations of fact sufficient to show ... that a grant of the application would be prima facie inconsistent with the [public interest]." 47 U.S.C. Sec. 309(d)(1). If the Commission determines that such a showing has not been made, it may dismiss the petition to deny with "a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition." 47 U.S.C. Sec. 309(d)(2).
 
 
 20
 The statutory scheme, therefore, does not mandate that every application pending before the Commission be designated for hearing. If no factual disputes exist or no specific allegations have been made in the petition to deny, there is no need for a hearing.[19] Where factual disputes exist, a hearing is not automatically required, for "[c]ontradictory allegations and affidavits which create some possibly unresolved factual issue do not invariably necessitate an evidentiary hearing before the Commission can judge whether an assignment would be in the public interest."[20] To determine whether a "specific and material" question of fact has been raised, this court must consider whether "relevant facts were adequately presented" to the Commission and whether any material properly before the Commission suggests "that a further hearing would produce additional facts that might change the result."[21] After careful review of the evidence submitted by the company to the Commission, we conclude that the allegations contained in the petition to deny raised no "specific and material" questions of fact that would warrant an evidentiary hearing on the County's applications and that the Commission acted properly when it granted the County's applications, finding them to be in the public interest.
 
 
 21
 B. Tele-Media's Challenges to the FCC's Order
 
 1. The Carroll Issue
 
 22
 Tele-Media asserts that the Commission erred when it failed to apply the doctrine enunciated in Carroll Broadcasting Co. v. FCC, 258 F.2d 440 (D.C.Cir.1958),[22] to the instant case. The company maintains that an evidentiary hearing pursuant to 47 U.S.C. Sec. 309(e) is mandated to evaluate the public injury that is said to result if the County's proposed translator system is authorized. The company urges that the FCC's order makes a "mockery" of the Carroll rule[23] and is inconsistent with its stated desire to promote cable carriage of local programming.
 
 
 23
 Tele-Media's opposition to the translator project is based principally on competitive grounds. The translator system, which will carry the three major network stations from Miami, one independent station, and the Miami educational station, will provide five of the channels offered by the twenty-channel cable system.[24] Tele-Media contends that as a result of the duplicative translator programs in the market, the majority of the subscribers would elect to terminate their subscriptions and switch to the free translator service. It argues that operation of the translators would thus inflict severe economic injury on the company, forcing it to curtail or discontinue its origination of local programming on the cable system. This local programming could not be replaced by the translators, because the County's translator system will lack the ability to originate any programming. This diminution in local programming, Tele-Media asserts, would represent a significant loss to the public. Accordingly, the company argues that the Commission erred by not conducting a Carroll hearing to consider the injury to the public interest.
 
 
 24
 We reject the company's contention that the Commission must conduct a hearing whenever an existing cable system faces threatened economic competition by a proposed translator system that might result in a reduction in the cable station's voluntarily produced local programming. We recognize that operation of the Monroe County translator system may cause existing Tele-Media subscribers to discontinue their subscriptions and may reduce the number of potential subscribers. This fractionalization of the viewing audience, no matter how economically harmful to the cable station, is not, however, sufficient to trigger a Carroll hearing because the Carroll doctrine is inapplicable to the projected loss of local programming that is voluntarily produced.[25]
 
 
 25
 The teaching of Carroll was that the clear benefits to the public of increased competition in the broadcast market might be outweighed by a concomitant net loss of public interest programming. The thrust of the court's concern was, however, the programming that the Commission compels licensed broadcasters to develop and fashion to meet community needs. Under complex and detailed procedures,[26] local stations are required to conduct regular efforts to ascertain community problems and needs, and to structure their programming to meet those needs.[27] In order further to encourage local programming, the Commission prohibits local stations[28] from airing more than three hours of network programming during prime-time evening hours, except for certain news, sports, children's, and public affairs programming.[29] To monitor broadcasters' compliance with these and other Commission rules designed to foster the public interest, the FCC has the authority to review broadcast station licenses every three years.[30] As a licensee's term comes up for renewal, the FCC is under a statutory duty to ensure that the broadcaster has fulfilled its public interest obligations.
 
 
 26
 Cable systems,[31] however, are not subject to the Commission's public interest programming requirements. As interstate communication, cable is regulated by the FCC.[32] In 1968, however, the Supreme Court limited the Commission's regulatory authority under the Communications Act of 1934 to that "reasonably ancillary" to the discharge of its authority to regulate over-the-air broadcasting.[33] Acting pursuant to this "reasonably ancillary" standard, the FCC promulgated a host of cable regulations. The Commission extended broadcasting's fairness doctrine[34] and equal time requirements[35] to cable.[36] It also adopted a comprehensive regulating scheme designed to ensure public, governmental, educational, and leased access[37] to cable systems.[38] The Supreme Court, however, in FCC v. Midwest Video Corp., 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), invalidated these access requirements. The Court held that the Commission exceeded its jurisdiction in promulgating these rules because they were not reasonably ancillary to the regulation of broadcasting. Id. at 708, 99 S.Ct. at 1445.
 
 
 27
 Broadcasters and cable operators, therefore, have radically different public responsibilities under the Communications Act and present FCC regulations. While both systems are subject to the fairness doctrine[39] and equal time requirements,[40] only licensed broadcasters are compelled to ascertain community needs and provide local programming.[41] Any local-origination programming that is offered by a cable service is gratuitous and may be discontinued at any time.[42] The cable operator will only originate local programs of public interest if its subscribers are willing to pay for such service.[43] If interest in such programming slackens or is not sufficient to support the service, the cable operator is free to discontinue the programming. Unlike broadcasters, moreover, cable operators are not subject to Commission review on a continuing basis.
 
 
 28
 The extension of the Carroll doctrine to local-origination programming by cable systems, as suggested by the company, would be an anomaly when viewed against this scheme. Although that programming may be in the public interest while it lasts, the Commission is justified in not relying on it in making a decision on a competing application. If Tele-Media succeeded in blocking the license for the translators, it could then cease public programming and the public would have neither a choice of systems, which the Commission's decision promotes, nor the counterbalancing benefits of local programming. As the Commission noted, the "basic fact" that the Commission does not have control over cable programming "puts [cable] originations outside of the Carroll analytical framework."[44]
 
 
 29
 This case is thus quite unlike the situation in H & B Communications Corp. v. FCC, 420 F.2d 638 (D.C.Cir.1969), upon which Tele-Media relies. In that case, it appeared that a new translator system might electronically interfere with the reception of television programming by an existing cable system's subscribers. This court held that the Commission should weigh the interests of cable subscribers against those of the rest of the community wishing to receive the free translator programming. Where one system would eclipse the other as a matter of pure physics, thereby foreclosing the community's chance to choose between the two, the location of the public interest was in doubt.
 
 
 30
 Here, however, it is clear that the installation of the translator system will provide the residents of the County with a choice of systems, which is surely in the public interest. See H & B; see also FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940) ("Congress intended to leave competition in the business of broadcasting where it found it, to permit a licensee who was not interfering electrically with other broadcasters to survive or succumb according to his ability to make his programs attractive to the public."). That local-origination programming might be reduced would be of countervailing concern except that there is no assurance that Tele-Media will continue to provide that programming in any case. In these circumstances, the Commission could properly ignore the potential diminution in local programming as beyond the scope of the Carroll doctrine. See Board of County Commissioners, 72 F.C.C.2d at 686-87.[45]
 
 2. Retransmission Consent
 
 31
 Section 325(a) of the Communications Act, 47 U.S.C. Sec. 325(a), provides that no licensed broadcast station may "rebroadcast the program or any part thereof of another broadcasting station without the express authority of the originating station." The Commission has expressly applied this requirement of retransmission consent to translators:
 
 
 32
 The licensee of a television broadcast translator station shall not rebroadcast the programs of any television broadcast station ... without obtaining prior consent of the station whose signals or programs are proposed to be retransmitted.
 
 
 33
 47 C.F.R. Sec. 74.784(b) (1981).
 
 
 34
 Tele-Media interprets this statute and its implementing regulations to mean that a television translator applicant must obtain three types of unqualified rebroadcast consent as a prerequisite to construction of the proposed translators: consent of each originating station for each program that the station originates and owns, such as locally produced news, public affairs, or entertainment programming; the consent of each network for every network program under contemplation for rebroadcast; and the consent of each program syndicator or owner for every non-network, nonlocal program under consideration. Brief of the Appellants at 45-51. The company asserts, and the County acknowledges, that the County only obtained qualified consents from each originating station and network. The company urges that the County's failure to obtain individual program consents expressly covering syndicated or nonlocal, non-network programming, and its failure to secure unqualified consents from each originating station and network violates section 325(a) and should have precluded grant of its license to construct the translators. The Commission's finding that section 325(a) does not require, as a prerequisite for a construction permit, the consent of each program owner on a program-by-program basis, argues the company, constitutes reversible error.
 
 
 35
 We reject the company's claim that a translator applicant must secure the retransmission consent of each program owner prior to obtaining a construction license. We need not reach the question of whether such program-by-program consent is required by section 325(a) before the translators begin operations because this issue is not ripe for judicial review. The statute prohibits rebroadcast without consent of the originating station; it does not contemplate that such consent need be obtained prior to the construction of the rebroadcasting facilities. Whatever retransmission consent is required by the Act is not legally necessary until just prior to actual translator operation.
 
 
 36
 The Commission, however, has recognized that, as a practical matter, the translator applicant must have a strong likelihood of obtaining the requisite consents, for without them the grant of an application would be essentially a "futile act." Springfield Television Broadcasting Corp., 34 F.C.C.2d 830, 831 (1972). To ensure that its action will not be "futile," the Commission requires each translator applicant to represent that it has obtained the requisite section 325(a) consent of the originating station when its construction permit application is filed. See FCC Form 346, sec. I, question 4(b), reprinted in 47 Fed.Reg. 21,505 (1982). Typically, the consents obtained by the translator applicants are not unconditional or unqualified; the Commission and this court have recognized that originating stations have justifiable reason for refusing to grant absolute, blanket permission for retransmitting their signals.[46] See WBBF, Inc., 24 F.C.C. 179, 186-88 (1958), aff'd sub nom. Federal Broadcasting System v. FCC, 266 F.2d 922 (D.C.Cir.), cert. denied, 361 U.S. 822, 80 S.Ct. 68, 4 L.Ed.2d 67 (1959). Accordingly, the Commission has not required a translator applicant to provide evidence of absolute satisfaction of section 325(a) consent requirements prior to initial licensing. It has processed and granted translator applications when the applicant has only provided qualified consents from originating stations.[47]
 
 
 37
 Monroe County has provided the Commission with such qualified consents. It obtained retransmission consent from each of the five stations whose programming it proposed to amplify and rebroadcast, and it obtained letters of consent for network programming from each of the three commercial networks and the Public Broadcasting System. Board of County Commissioners, 72 F.C.C.2d at 689; see J.A. 403-55. It also sought the consent of four syndicators; none of these program owners explicitly denied its consent and each indicated a willingness to grant consent if specific licensing arrangements were made. See J.A. 720-36. The Commission found such qualified consents adequate and granted the construction permit.
 
 
 38
 The company asserts, however, that the Commission, in its ruling, held that section 325(a) only requires the consent of the originating station prior to rebroadcast. Brief of Appellants at 45. We believe that the company has misread the Commission's decision. In its opinion, the Commission did no more than authorize construction of the translators. The applications for the construction permits were the only issues pending before the Commission. The construction permits issued by the Commission to the County merely allow construction: they expressly state that they do not authorize operation of the translators.[48] After construction is completed, the County must file separate applications for licenses to operate the translators; the applications must demonstrate that the construction complied with the permit specifications and that all applicable regulations have been satisfied. See 47 C.F.R. Sec. 74.14 (1981); FCC Form 347, question 3. After examination of these applications, the Commission will have the opportunity to determine whether the section 325(a) requirements have been met. At that time, Tele-Media will be able to assert before the Commission its claim that the statute compels program-by-program retransmission consent. If the Commission rules that section 325(a) only requires the consent of the originating station, Tele-Media will then have the opportunity to renew its arguments before this court.
 
 
 39
 We therefore hold that when a translator applicant has filed applications for construction permits with the Commission, the Commission is empowered to authorize construction of the translators without requiring the applicant to produce retransmission consents for each program under contemplation for rebroadcast. We do not decide whether individual consent by each program owner is a necessary prerequisite for actual rebroadcast of the programs or whether section 325(a) merely requires the consent of the "originating station" for translator operation. The proposed translator system for the County has not yet been built and will not be ready to rebroadcast programs for quite some time. Accordingly, determination of the question of whether the County has secured the consents required by section 325(a) in anticipation of operating the system would be premature at this time. See generally Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-464, 81 L.Ed. 617 (1937).
 
 3. Monroe County's Financial Qualifications
 
 40
 Tele-Media next challenges the financial qualifications of the County, asserting that a hearing is required pursuant to 47 U.S.C. Sec. 309(e) to resolve factual questions involving the accuracy of cost projections and availability of committed funding. We find their contentions to be general and conclusory, lacking the specificity required by statute. These allegations, therefore, do not raise substantial and material questions of fact appropriate for a hearing.[49]
 
 
 41
 The County estimated that the proposed translators would cost $497,471 to construct and $32,600 to operate for one year; it included $575,000 in its annual budget as a separately identifiable appropriation. J.A. 295, 397. It supported this cost estimate with a letter from the Board's legal advisor that stated that the County's adoption of the translator budget item constituted a fixed appropriation the funding of which was guaranteed. J.A. 399. Tele-Media challenged the County's showing of financial qualification on two separate grounds--the reasonableness of the County's estimates and the availability of the funds. J.A. 92-95, 675-688. Based on its "experience gained from processing several hundred translator applications annually," the Commission found the County's estimates to be "reasonable and reflective of current market costs." 72 F.C.C.2d at 688. It also ruled that the fixed appropriation for the project was greater than the estimated cost of construction and first-year operation and provided adequate assurance that sufficient funds would be available to construct and operate the translators.
 
 
 42
 On appeal, Tele-Media argues that the Commission decision was arbitrary and capricious because the Commission simply accepted the County's cost estimate and budget allocation as evidence that the County had the ability to finance the project. This action, asserts the company, is directly contrary to the stringent financial qualifications test that the Commission adopted in Ultravision Broadcasting Co., 1 F.C.C.2d 544 (1965). It urges this court to remand the case to the Commission for an evidentiary hearing pursuant to 47 U.S.C. Sec. 309(e) on the issue of the County's financial resources.
 
 
 43
 We reject the company's suggestion that we should remand this case to the Commission. At the outset, we note that the figures submitted by the County to the Commission are estimates, not balance sheets. The County, in its applications and subsequent amendments, provided detailed explanations of the cost of the proposed translator system. Tele-Media asserted that these estimates were not realistic. It failed, however, to carry its burden under section 309(d)(1) of the Act, 47 U.S.C. Sec. 309(d)(1): it failed to present "specific allegations of fact" that called into question the accuracy of the County's estimates. The company has not demonstrated that these cost estimates are not reflective of current market costs.[50] It has not offered to submit particularized evidence to support its allegation that the County's cost estimates are inaccurate or insufficient.[51] Because the company failed to present any specific allegations of fact that challenged the County's estimates of construction and operating costs, the Commission had no statutory obligation to designate a hearing on this issue.
 
 
 44
 Similarly, the challenge to the availability of the funds must also fail. In reviewing applications for translator licenses, the Commission has required applicants to demonstrate no more than a "reasonable assurance" that the funds will be available at the proper time. Crosby N. Boyd, 57 F.C.C.2d 475, 489 (1976); see also Multi-State Communications, Inc. v. FCC, 590 F.2d 1117 (D.C.Cir.1978); Jay Sadow, 39 F.C.C.2d 808, 810 (Rev.Bd.1973). In its applications, the County clearly showed that it had budgeted for the then most recent fiscal year $575,000 for the proposed translators, some $45,000 more than the estimated cost of construction and first-year operation. Board of County Commissioners, 72 F.C.C.2d at 688; J.A. 804-24. The County demonstrated that the money had been appropriated from available funds, that there was no question as to its availability, that the funds had been appropriated expressly for the translator system, and that neither ratification by the voters nor approval by any other government body was necessary. J.A. 295. The County also submitted an opinion letter from the Board's legal adviser stating his opinion that under Florida law the expenditures budgeted for the translators constituted a fixed appropriation the funding of which was guaranteed. J.A. 399. It is therefore our view that the County demonstrated, with reasonable assurance, that the funds necessary for construction and operation of the system were available and committed.[52]
 
 4. Need for the Translators
 
 45
 Tele-Media alleges that the Commission's order is contrary to section 74.732(b) of its rules because it placed the burden on the company to make an initial prima facie showing of lack of need for the proposed translators. This action, so it is said, subverted the actual wording of the rule, which assertedly places the initial burden on the applicant to demonstrate the need for the proposed translators.
 
 
 46
 The rule applied by the Commission reads as follows:
 
 
 47
 More than one television broadcast translator station may be licensed to the same applicant, whether or not such stations serve substantially the same area, upon an appropriate showing of need for such additional stations.
 
 
 48
 47 C.F.R. Sec. 74.732(b) (1977); see 25 Fed.Reg. 7317, 7322-23 (1960).[53] The rule was intended to make clear that multiple-ownership and duopoly restrictions applicable to other broadcast stations would not apply to translators because of the passive and limited function of these kinds of stations. Id.[54]
 
 
 49
 The Commission replies that although the language of the rule may be susceptible of an interpretation that would place the burden of showing need on the applicant, the Commission has consistently interpreted it to require a prima facie showing of lack of need, because the need for the translators can be presumed regardless of the number applied for. See, e.g., Porter Mountain Antenna TV Ass'n, 61 F.C.C.2d 724 (1976). The Commission asserts that we should defer to the agency's interpretation of its own rule.
 
 
 50
 We need not reach the validity vel non of the Commission's policy of requiring the objecting party to make a prima facie showing of lack of need or the question of whether a need can be presumed in certain circumstances, because in this case it appears that the Commission found an adequate showing of need without relying on the allocation of the burden of persuasion.
 
 
 51
 The Commission found that "the need for the proposed translators in Monroe County is abundantly clear," because "the vast majority" of the population is unserved by off-the-air television service, and "some 15 percent" of the population in the limited areas served by cable is without any television service at all. 72 F.C.C.2d at 687. The underlying factual findings of the extent of cable and off-the-air service were undisputed, and were in any case completely supported by evidence in the record.[55] We agree that where, as here, the area proposed to be served by the translators is presently underserved by cable television and, in any case, unserved by off-the-air television, Congress in section 1 of the Communications Act[56] and the Commission in its continuing development of the concept of a translator license[57] have decided that translators fill a public need.[58] The Commission's finding that there was a need for the translators in Monroe County is thus consistent with the applicable law.
 
 
 52
 The Commission further found that all 25 of the translators were required to fill that need. 72 F.C.C.2d at 687 (evidence was "sufficient to support a need for the proposed translators"). This finding was largely undisputed.[59]
 
 
 53
 In its reply brief on appeal, however, Tele-Media asserts that the showing of need that is required by the language of section 74.732(b) is need for a single entity to own all the translators required to provide service to the area. Reply Brief of the Appellants at 32. Given the evident thrust of the section to deal with multiple ownership and duopoly, the company's reading is not implausible. Nevertheless, we think the language of the relevant phrase--"an appropriate showing of need for such additional stations"--should be read to require, if anything, only a showing that additional translators are needed to serve an area, and not that there is some special need for a single entity to own all of them. This appears to have been the Commission's consistent interpretation of the showing of need that would be required,[60] and we must give the agency's interpretation of its own rules "controlling weight" unless it is "plainly erroneous." Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).
 
 
 54
 5. The Request to Hold the Applications in Abeyance
 
 
 55
 Tele-Media contends that the Commission abused its discretion by not holding Monroe County's application in abeyance pending resolution of the FCC's inquiry into the future role of low-power television broadcasting and television translators. See Notice of Inquiry, supra note 3; Low-Power TV Rules, 45 Fed.Reg. 69,178 (1980) (notice of proposed rulemaking); id., 47 Fed.Reg. 21,468 (1982) (final rules), as corrected, 47 Fed.Reg. 30,495 (1982). The company asserts that the issues it raised in its pleadings "touched upon" matters under reexamination in the Commission's investigation of the subject, Brief of the Appellants at 58-64, and that the similarity between the questions raised by the applications and the questions raised in the Inquiry should have compelled the Commission to hold the application in abeyance.
 
 
 56
 In announcing the initiation of a proceeding to consider new approaches to increasing the diversity of television services to the public, the FCC clearly stated its intent to continue processing routine translator applications that do not raise any novel issues under the existing rules.[61] The County's applications were routine. The translator system proposed by the County would function only to rebroadcast the off-the-air signals of the five Miami stations, a service permissible under the existing rules; this particular translator proposal was thus neither novel nor nonroutine, but rather envisioned no more than the traditional translator function of simultaneous rebroadcast. Similarly, we find that none of the issues raised by Tele-Media presents any novel questions of law. Accordingly, we conclude that the Commission did not abuse its discretion when it declined to hold the matter in abeyance.[62]
 
 
 57
 For the foregoing reasons, the order of the Federal Communications Commission under review is affirmed.
 
 
 58
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 Tele-Media Corporation has a management contract with and owns a portion of Tele-Media Company of Key West
 
 
 [2]
 Tele-Media Company of Key West owns and operates a cable television system in Monroe County
 
 
 [3]
 See An Inquiry into the Future Role of Low-Power Television Broadcasting and Television Translators in the National Telecommunications System, 68 F.C.C.2d 1525 (1978) [hereinafter cited as Notice of Inquiry]; see also Low-Power TV Rules, 45 Fed.Reg. 69,178 (1980) (notice of proposed rulemaking, adopted Sept. 9, 1980). The rulemaking has since been completed. Low-Power TV Rules, 47 Fed.Reg. 21,468 (1982) (final rules, adopted March 4, 1982), as corrected, 47 Fed.Reg. 30,495 (1982) (to be codified in scattered sections of 47 C.F.R. pts. 73, 74, 76 & 78)
 
 
 [4]
 Most of Monroe County's population lives outside of the Grade B contour of any television station. Board of County Commissioners, Monroe County, Florida, 72 F.C.C.2d 683, 684 (1979); see infra note 55. The Grade B contour of a station marks the approximate outer boundary for satisfactory off-the-air viewing under normal circumstances. See 47 C.F.R. Sec. 73.683 (1981). Thus, most County residents cannot receive satisfactory off-the-air television service
 
 
 [5]
 The term "off-the-air" refers to television service received directly over the air from a television transmitter without use of wire or cable. This service is provided at no direct cost to the consumer
 
 
 [6]
 Cable-Vision had been serving only the city of Key West, the community at the southwesternmost point of the Keys, under a franchise granted by the city in 1954. Joint Appendix ("J.A.") 292
 
 
 [7]
 These stations are WTVJ (CBS), WCKT (NBC), and WPLG (ABC). The CATV system did not carry the Miami independent station, WCIX-TV, or any educational station
 
 
 [8]
 Low-Power TV Rules, 47 Fed.Reg. 21,468, 21,468 (1982) (final rules). The Commission's rules define a television translator as follows:
 (a) Television broadcast translator station. A station in the broadcast service operated for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency and amplitude, for the purpose of providing television reception to the general public.
 
 
 [47]
 C.F.R. Sec. 74.701 (1981). Essentially, the translator acts as a booster by receiving the signal from the main station and translating it over the air on a different channel for direct off-the-air reception in the area served by the translator. Unlike other forms of low-power television, see generally Low-Power TV Rules, supra, and unlike cable television, translators presently have only a limited ability to originate programming. See 47 C.F.R. Sec. 74.731(f) (1981) (translators may originate 30 seconds of financial solicitations or acknowledgments per hour)
 
 
 [9]
 From the inception of television broadcasting, smaller communities and sparsely settled areas of the country have suffered from inadequate television service and program choice relative to more densely settled areas. These smaller communities tended to be those such as Monroe County where rough terrain or geographic location prevented reception of television signals, or those that had such a small and scattered population that they lacked the economic base to make regular advertiser-supported stations feasible. Translator systems were designed to fill this void by distributing signals in areas where acceptable signals could not be received directly from the originating broadcast station. See "Television Translators-Historical Perspective," reprinted in Notice of Inquiry, supra note 3, app. B
 
 
 [10]
 Florida state courts rejected that challenge and affirmed the County's right to operate the translators. Cable-Vision, Inc. v. Freeman, 324 So.2d 149 (Fla.App.1975), appeal dismissed, 336 So.2d 1180 (Fla.1976) (mem.), appeal dismissed for want of a substantial federal question, 429 U.S. 1032, 97 S.Ct. 723, 50 L.Ed.2d 743 (1977)
 
 
 [11]
 Tele-Media requested the Board's approval of the sale, and its president, Robert E. Tudek, testified before the County Commissioners on August 26, 1975. When asked about the impact of the County's translator plan on the CATV system, Tudek stated, "I know of no translator ever hurting any cable system nationwide. I mean they're not competitors ...." J.A. 490-91
 
 
 [12]
 In addition, Tele-Media began to originate 65 hours of varied programming per week, which included 20 hours of local programming, and initiated a channel of continuous local weather information. Brief of the Appellants at 6; see J.A. 167-72. Tele-Media added to the three network stations it already carried stations WCIX, a Miami independent station; WPBT/WTHS, an educational, shared-use channel; and WKID, a Fort Lauderdale independent station. J.A. 166. It made plans to add WLTV, a Miami-Fort Lauderdale Spanish station; WHFT, a religious channel; station CMQ from Cuba; WTBS, an Atlanta-based independent station; and the Christian Broadcasting Service. Brief of the Appellants at 6; see J.A. 166 n. 2, 171-72
 
 
 [13]
 The applications stated that the translators would be used to rebroadcast five Miami stations: WTVJ (CBS), WCKT (NBC), WPLG (ABC), WCIX (independent), and WPBT/WTHS (noncommercial educational TV)
 
 
 [14]
 This assertion was in direct contrast to the statements made by Tele-Media's president to the County Commissioners in 1975. See supra note 11
 Tele-Media produced a survey that purported to show that up to 63% of its subscribers would drop CATV if the translators were built. J.A. 542-45. If the survey's prediction turns out to be accurate, there is some suggestion in the record that the drop in subscribers could be explained in part by public dissatisfaction with Tele-Media's service. Letters from Keys citizens, addressed to the County and to local newspapers, complained of high monthly rates, poor service, and the company's persistent battle against the translator plan. See J.A. 771-74.
 
 
 [15]
 When the County first proposed the translator system, it estimated the cost of the facility to be $530,071. J.A. 30. It submitted extensive documentation to support its claim that the necessary funds were "legally committed" to the proposal. J.A. 804-24. In the interim, the estimated cost of the 25 translators has risen to $1,200,000. Intervenor's Supplemental Brief on the Issue of Translator Financing, app. at 2
 
 
 [16]
 These five issues remain Tele-Media's claim in its petition presently before the court. The company also raised a host of minor issues before the Commission that were rejected and that it has apparently abandoned on appeal. These claims included (1) the harmful environmental impact of the construction, J.A. 106-09, 312-20, 713-17; (2) flaws in the County's engineering proposal, J.A. 110-12, 372-76, 718-19; (3) unfair competition, J.A. 224-28, 367, 369-70, 590-92; and (4) cross-ownership, J.A. 95-100, 298-303, 701-12
 As to the claim that Sec. 1.1331 of the Commission's rules, 47 C.F.R. Sec. 1.1331 (1981), required that an environmental impact statement be filed, the Commission pointed out that that section requires only that such information be submitted in connection with applications to construct "major communications" facilities. 72 F.C.C.2d at 692. A major facility, the Commission said, is defined in Sec. 1.1305, 47 C.F.R. Sec. 1.1305 (1981), and none of the County's translators fall within the purview of that definition. 72 F.C.C.2d at 692.
 Tele-Media's criticism of the engineering proposal had related to the sufficiency of the County's justification for use of frequencies below Channel 55. The Commission noted that the County's channel selection was "premised on not duplicating frequencies" and that "[t]his criterion [was] necessitated by the unusually good propagation conditions in the Keys." Id. at 693. Although Tele-Media had asserted that the propagation problem could be resolved in an alternative manner, J.A. 153, 373-74, the Commission explained that that alternative would probably force some viewers to purchase more than one antenna, 72 F.C.C.2d at 693.
 Tele-Media's assertion that the proposed translators would constitute unfair competition was also found to be without basis. The company had complained that although the cable system would be subject to copyright liability, the translators would be exempt. The Commission, however, observed that "the thrust of [those] allegations [was] regulatory parity between translators and cable television" and that "[a]n adjudicatory proceeding is not the proper vehicle in which to consider such a question." Id. at 691-92.
 
 
 [17]
 West Michigan Telecasters, Inc. v. FCC, 396 F.2d 688, 691 (D.C.Cir.1968)
 
 
 [18]
 Southwestern Operating Co. v. FCC, 351 F.2d 834, 835 (D.C.Cir.1965) (footnote omitted)
 
 
 [19]
 Stone v. FCC, 466 F.2d 316 (D.C.Cir.1972); Hale v. FCC, 425 F.2d 556 (D.C.Cir.1970)
 
 
 [20]
 Broadcast Enterprises, Inc. v. FCC, 390 F.2d 483, 485 (D.C.Cir.1968)
 
 
 [21]
 Capitol Broadcasting Co. v. FCC, 324 F.2d 402, 405 (D.C.Cir.1963); see also Marsh v. FCC, 436 F.2d 132, 135-36 (D.C.Cir.1970)
 
 
 [22]
 See supra text accompanying note 14
 
 
 [23]
 Brief of the Appellants at 30
 
 
 [24]
 The remaining fifteen channels will carry more distant network stations, independent stations, and local programming. See supra note 12
 
 
 [25]
 The Commission in its opinion raised some question as to whether any decrease in public service programming would in fact result. It noted that "recent scholarship ... has cast doubt on the view that decline in revenues of a station will result in dramatic curtailing of public service programming," 72 F.C.C.2d at 687 n. 2, and quoted a staff report that concluded that " 'even if revenues actually declined there would be only a minor change in the quantity of such programming on the air,' " id., quoting Economic Inquiry Report in Docket 21284, FCC 79-241, p 141 (released May 7, 1979)
 We note in passing that Tele-Media appears to be in a position to compete vigorously with the new translators. The translators will only duplicate five network stations from Miami. Tele-Media will have 15 unduplicated channels remaining on its 20-channel system that it can use to provide distant-signal or local-origination programming. In pleadings filed before the Commission, the company indicated that it had plans to add several services that could not be duplicated by the translators, such as a channel that would feature the games of the Atlanta professional sports teams as well as a schedule of six movies every twenty-four hours. J.A. 171; see J.A. 776-78. Tele-Media also provides or plans to add child-development programs, produced in conjunction with the Monroe County school system, cablecasts of local felony trials, Spanish-language programming, and expanded coverage of local government proceedings, local sporting events and local fundraisers. J.A. 168-72.
 
 
 [26]
 See 47 C.F.R. Sec. 73.3526 (1981); Primer on Ascertainment of Community Problems By Broadcast Renewal Applicants, 41 Fed.Reg. 1381-83 (1976)
 
 
 [27]
 See 41 Fed.Reg. at 1372-80; see also Prime Time Access Rule, 40 Fed.Reg. 4001, 4010 p 60 (1975)
 
 
 [28]
 The rule by its terms applies only to network-affiliated stations in the top fifty television markets in the country, but it has resulted in an across-the-board reduction in network programming. See 40 Fed.Reg. 4001, 4001 p 4 (1975)
 
 
 [29]
 Prime Time Access Rule, 47 C.F.R. Sec. 73.658(j), (k) (1981); see 40 Fed.Reg. 4001 (1975)
 
 
 [30]
 47 U.S.C. Sec. 307
 
 
 [31]
 Cable television is distinguished from over-the-air broadcasting in that its final delivery of programs to the individual viewer's television set is by means of a direct cable link rather than by radio waves
 
 
 [32]
 United States v. Southwestern Cable Co., 392 U.S. 157, 167-69, 88 S.Ct. 1994, 1999-2000, 20 L.Ed.2d 1001 (1968)
 
 
 [33]
 Id. at 178, 88 S.Ct. at 2005
 
 
 [34]
 47 C.F.R. Sec. 73.1910 (1981). See Fairness Doctrine and Public Interest Standards, 39 Fed.Reg. 26,372 (1974); In re Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949). The Supreme Court has upheld the doctrine as consistent with the Communications Act and the first amendment. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)
 Under the fairness doctrine, stations are not prohibited from editorializing their own opinions but are subject to an affirmative duty to encourage persons holding contrary views to present their positions. The opposing view need not be presented simultaneously; the broadcaster, however, must make a good faith effort to afford the opposition air time.
 
 
 [35]
 47 U.S.C. Sec. 315. The equal time provision compels broadcasters to "afford equal opportunities" to any "legally qualified candidate" for a public office, once one candidate for the same office has been permitted to "use" the broadcaster's station. All candidates can be charged no more than the station's standard charge. An appearance by an incumbent or any challengers on a bona fide newscast, news interview or documentary, or on-the-spot coverage of a bona fide news event is exempt from this provision. Id
 
 
 [36]
 47 C.F.R. Secs. 76.205, .209 (1981)
 
 
 [37]
 In 1969, the FCC adopted a "mandatory origination" rule. 34 Fed.Reg. 17,651 (1969). It required cable television systems with over 3500 subscribers to originate a significant amount of local programming. This rule was promulgated for the purpose of "increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services." Id. at 17,651. The rule was sustained by a sharply divided Supreme Court in United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). The implementation of the rule had been stayed during the course of the litigation. Shortly after the decision issued, the FCC rescinded the rule. The Commission found that "[t]he net effect of attempting to require origination has been the expenditure of large amounts of money for programming that was, in many instances, neither wanted by subscribers nor beneficial to the system's total operation." 39 Fed.Reg. 43,302, 43,308 p 33 (1974). The Commission said that the "creativity and interest" necessary for effective local programming would be better fostered by market demand or operator interest than by legal requirement. Id
 While the stay of the 1969 order was in force, the FCC promulgated a variety of access, capacity, and facility requirements. In 1972, the Commission prescribed rules requiring all cable systems within the top 100 television markets to be constructed with a minimum capacity of 20 channels and to dedicate four of those channels for public, governmental, educational, and leased access. Cable Television Report and Order, 37 Fed.Reg. 3252 (1972), amended, id. at 13,848.
 In 1976, the Commission revised these access rules and extended their coverage to include all cable systems with more than 3500 subscribers. Cable Television Channel Capacity and Access Channel Requirements, 41 Fed.Reg. 20,665 (1976). These rules called for systems to have a minimum 20-channel capacity and the capability to return nonvoice communication. 47 C.F.R. Sec. 76.252 (1979). To the extent of their "activated channel capability," cable stations had to dedicate four channels for public access. Id. Sec. 76.254(a). A minimum of one channel had to be set aside for shared access. Id. Sec. 76.254(b). A local production studio and equipment had to be available for public access. Id. Sec. 76.256(a). Cable operators were barred from controlling the content of these channels. Id. Sec. 76.256(b). Access had to be provided on a nondiscriminatory basis. Id. Secs. 76.256(d)(1)-(3). Operators were barred from charging for channel time on one public access channel. Id. Sec. 76.256(c)(2). They were barred for five years from charging for time on educational and governmental channels. Id. Sec. 76.256(c)(1). Facilities used to provide a live public access program of up to five minutes in length had to be provided free. Id. Sec. 76.256(c)(3). Beyond that, charges for public access production facilities had to be "reasonable." Id.
 
 
 [38]
 In addition, the FCC promulgated a set of rules that controlled the nature and source of cable programming:
 a. Mandatory-local-carriage rules compelled cable systems to carry all of the local broadcast stations in their service area. 47 C.F.R. Secs. 76.51-. 65 (1981).
 b. Nonduplication rules forced cable operators to black out programs from distant markets if the programs were shown simultaneously on a local over-the-air station. Id. Sec. 76.92-.99.
 c. Distant-signal-carriage rules placed numerical limits on the number of nonlocal stations cable systems could import, based upon the size of the local market and the number of existing network broadcast and independent stations. 47 C.F.R. Secs. 76.57-.65 (1979) (repealed 1980).
 d. Syndicated-exclusivity rules afforded non-network (independent) programming the same protections afforded network programming by the nonduplication rules. The rules required a cable operator to black out a syndicated program received on a distant signal if the program was licensed to a local station. Id. Secs. 76.151-.161 (repealed 1980).
 e. Sports-carriage rules required the blacking out of certain local sports events on imported stations. 47 C.F.R. Sec. 76.67 (1981).
 In July of 1980, the FCC largely deregulated cable television, eliminating the principal rules that had restricted the number and types of signals a cable operator could provide to its subscribers, although the mandatory-local-carriage, nonduplication, and sports-carriage rules remained in effect. Cable Television Syndicated Program Exclusivity Rules, 45 Fed.Reg. 60,186 (1980). For a thorough discussion of the effect of the deregulation on the cable and broadcasting industry, see Note, The Collapse of Consensus: Effects of the Deregulation of Cable Television, 81 Colum.L.Rev. 612 (1981).
 
 
 [39]
 Compare 47 C.F.R. Sec. 73.1910 (1981) with id. Sec. 76.209
 
 
 [40]
 Compare 47 U.S.C. Sec. 315 with 47 C.F.R. Sec. 76.205 (1981)
 
 
 [41]
 See supra text accompanying notes 26-29
 
 
 [42]
 While the Supreme Court upheld the FCC's mandatory-origination requirement for cable operators, the rule was abolished by the FCC as soon as it was empowered to enforce the obligation. See supra note 37
 
 
 [43]
 This court recognizes that the franchise agreements between cable operators and municipalities may compel the operators to furnish local programming. For a description of such arrangements, see Miller & Beals, Regulating Cable Television, 57 Wash.L.Rev. 85, 113-16 (1981); Note, Access and Pay Cable Rates: Off-Limits to Regulators After Midwest Video II?, 16 Colum.J.L. & Soc.Probs. 591, 613-30 (1981)
 The court, however, knows of no such obligations that bind Tele-Media. The company alludes to such requirements, Reply Brief of the Appellants at 19, but never describes specific contractual provisions. We express no opinion, therefore, as to whether the presence of such agreements would affect the result in this case.
 
 
 [44]
 This refusal to examine Tele-Media's local programming to determine whether it outweighs the public benefits of the translator system may be seen as a corollary of the Commission's 1974 decision that market demand and operator interest would be more likely than legal requirements to produce high-quality, effective local programming by cable systems. See supra note 37. A determination of whether Tele-Media's local programming was of such a benefit to the public as to outweigh the loss of choice allegedly necessary to maintain it would likely require the Commission to gauge the extent and quality of that programming. The result might well be that cable systems would feel obligated to provide local programming that would meet the Commission's apparent standards as a device to ward off licensing of competing translators. Thus the Commission's processes would be used to reach a result that the Commission has decided would be better reached by market forces. We are reluctant to require the Commission to enter a field that it has, based on its prior experience and informed judgment, expressly declined to regulate
 
 
 [45]
 In its recent low-power-television rulemaking, the Commission reaffirmed its holding in the instant case, restating it as "[o]ur holding in Monroe County Board of Commissioners, 42 FCC 2d 683 (1979), that the 'Carroll' doctrine should not apply to cable systems." Low-Power TV Rules, 47 Fed.Reg. 21,468, 21,484 p 64 (1982) (final rules). A broad reading of this statement might lead one to infer that a Carroll-type hearing is never required to sort out the effect on the public interest of a translator license that might have some effect on an existing cable system. In light of H & B, we cannot endorse such a broad reading. In our view, the Commission's decision in the instant case is only that Carroll does not apply to the projected loss due to economic competition of local-origination programming voluntarily produced by cable stations
 Tele-Media's protestations that the competition posed by the translators would be "fatal" to it, resulting in a reduction in choice to the public, Brief of the Appellants at 22, are unavailing. Tele-Media would only lose business if it failed to offer competitive service. The choice would be in the hands of the people of Monroe County, and the provision of such a choice, in the absence of countervailing detriments, has consistently been viewed by the courts and by the Commission as in the public interest.
 As the Commission pointed out in its brief on appeal, Brief for Appellee at 36 n.23, the result in this case is consistent with its statutory mandate to make communications service available "to all the people of the United States," 47 U.S.C. Sec. 151 (emphasis added). In implementing this command, the Commission has established as a priority in assigning licenses that each community be provided with "at least one television broadcast station." See Thunder Bay Broadcasting Corp., 47 F.C.C.2d 1227, 1239 n.22 (1974) (emphasis added), quoting Amendment of Section 3.606 of the Commission's Rules and Regulations, 41 F.C.C. 148, 167 (1952). A denial of the application in this case would be contrary to this statutory and regulatory policy because it would promote local television service to some--those who can afford to pay for Tele-Media's cable programming--at the expense of even minimal service to all. It is unclear to what extent the Commission relied on this rationale in its decision, however, and so we place no weight on it here. See generally SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).
 
 
 [46]
 This licensing policy recognizes the practical problems inherent in Tele-Media's approach. An originating station does not own the copyrights for many of the programs scheduled for broadcast, and it may require the translator operator to obtain the rebroadcast authority from the copyright holder. See, e.g., Letter of WTVJ, J.A. 421; Letter of WCKT, J.A. 425. An originating station cannot predict whether one of its program suppliers might impose contract provisions requiring it to deny rebroadcast with respect to specific programming. See, e.g., License Agreement of Warner Brothers, J.A. 723; Frontier Broadcasting Co. v. FCC, 412 F.2d 162, 163 (D.C.Cir.1969). Every originating station has a number of program suppliers whose identities vary over time and whose interests cannot be readily ascertained in advance of a translator's licensing. In this instance, the County's ability to secure the consent of every program supplier in advance of its translator authorization was hampered by the fact that the originating stations had not planned their program schedules and that the identities of the specific syndicators were thus unknown. When the County approached four major syndicators--Warner Brothers, Viacom International, Inc., United Artists, and Paramount Pictures Corp.--each syndicator refused to write a blanket consent agreement and indicated that it would determine whether to grant consent on a case-by-case basis depending on such factors as the particular program involved, market considerations, and the payment of additional license fees. J.A. 787-88
 
 
 [47]
 In Storm King T.V. Ass'n, Inc., 20 F.C.C.2d 348, 349 (1969), the Commission accepted a station consent that provided that such consent "shall not be deemed to cover such rights of third persons, or to constitute a representation that the undersigned [station] has authority to permit your [translator] station to utilize such programs." In considering this provision the Commission provided the following pertinent guidance:
 Unlike the situation in Frontier Broadcasting Company v. Federal Communications Commission, 134 U.S.App.D.C. 31, 412 F.2d 162, 15 R.R.2d 2048, the station has neither specifically withheld its consent for the rebroadcast of network programs nor has it conditioned its consent on network approval. It has merely recognized that it cannot give consent for the rebroadcast of programs in which others may have property rights and it seeks release from legal liability for the use of such programs. Obviously, therefore, if those who have such property rights do not object to the rebroadcast of their programs, the applicant has the necessary rebroadcast consent.
 Id.
 
 
 [48]
 Each construction permit bears the following caveat: "This permit DOES NOT AUTHORIZE OPERATION OF THE FACILITIES SPECIFIED HEREIN except for the conduct of EQUIPMENT TESTS pursuant to section 74.13 of the Commission's Rules." FCC Form 364
 
 
 [49]
 We note that if a hearing could be invoked merely upon the assertion of financial inability, the Commission's task under 47 U.S.C. Sec. 307 would be a hopeless one
 
 
 [50]
 It would have been a simple matter, for example, for Tele-Media to have examined other applications filed for translator permits to determine how the County's estimates compared and point out any inconsistency. Tele-Media could have approached several equipment manufacturers to determine an average cost for equipment for translators of this type and pointed out any inconsistencies between that information and the information submitted by the County, which listed the make and model of the proposed transmitters and antennas. Tele-Media, however, provided no specific information calling into question the County's estimates. See, e.g., J.A. 92-95, 675-88, 830-32
 
 
 [51]
 Tele-Media's only specific challenge to the County's showing was based on a newspaper article quoting one of the County Commissioners and on a denial by HEW of an application for funding for the translator construction. See J.A. 93-94. The County fully explained why neither of the issues presented any substantial questions as to its financial qualifications. See J.A. 296-97
 
 
 [52]
 The company, however, now asks this court to disregard the County's 1979 financial qualifications and consider the County's present ability to fund the project. Appellant's Supplemental Brief on the Issue of Translator Financing. It urges the court to hold the matter in abeyance pending the Commission action on a motion filed by the company to revoke the County's construction permits. The company states that it has filed the motion to revoke on the grounds that the cost of the project has nearly tripled, that no construction steps have been taken, that the County's budget allocation for the translators has been deleted, and that the County is searching for ways to finance construction of the translators not contemplated in its original applications. Id. at 4-6
 During the past three years, the cost of the project has increased dramatically. The County now estimates that the cost of construction and operating expenses for the first three months has risen to $1,200,000. County Resolution No. 152-1981, appended to Intervenor's Supplemental Brief on the Issue of Translator Financing. Because the County has been unwilling to undertake construction of the translators until this court has disposed of this case, it deleted the line item for the translators from its budget. Concurrent with this deletion, however, was the adoption by the County of a resolution of its intent to finance the construction and initial operation of the proposed translator system through appropriations or the establishment of a special recreational taxing district pursuant to Fla.Stat. Sec. 418.20 (Supp.1982) and the sale of revenue bonds up to $1,500,000 subject to a voter referendum.
 The issue of the County's present financial qualifications is not properly before this court. When the Commission rules on the pending motion, its decision may be appealed to this court.
 
 
 [53]
 The Commission amended this rule in 1978 by deleting the final phrase relating to a showing of need. See 43 Fed.Reg. 14,660 (1978); 47 C.F.R. Sec. 74.732(b) (1981). The Commission, however, did not rely on this amendment in the order under review. On appeal, Tele-Media has chosen to challenge the manner in which the Commission adopted the amendment. Brief of the Appellants at 43-44. Because the Commission did not rely upon the revision, the questions raised by the company concerning the proceeding that amended the rule are not before this court. If Tele-Media desired review of this section, its remedy was to seek review of the order in that proceeding
 
 
 [54]
 The multiple ownership and duopoly rules essentially operate to limit the number of broadcast stations that an individual can own and also to limit ownership in stations whose signal coverage overlaps. See 47 C.F.R. Secs. 73.35, .240, .636 (1981). It would be impractical to apply these rules to translators. Unlike broadcast stations, translators are not considered "voices" in the first amendment sense because they lack the ability to originate programming. See Low-Power TV Rules, 45 Fed.Reg. 69,178, 69,184 (1980) (notice of proposed rulemaking). One television translator unit can only rebroadcast and amplify the signals of one broadcasting station to a limited geographical area. To provide line-of-sight coverage of this one station to a large geographical area, a number of individual translators are needed for each central unit. Each translator is placed in a strategic geographic location: it functions to receive, amplify, and broadcast the relevant signal of the central translator unit to the residents in the immediate area, and to relay the signal to another translator in a different part of the community served by the system. For each station that a translator system seeks to rebroadcast, a translator unit and individual translators are needed to achieve service over the geographical area
 In its recent low-power-television rulemaking, the Commission extended the provision allowing multiple ownership to low-power television stations, even though they have the ability to originate programming. See Low-Power TV Rules, 47 Fed.Reg. 21,468, 21,487-89, 21,499 (1982) (final rules). The rationale was the need to bring television to underserved areas and the tenuous viability of low-power television.
 
 
 [55]
 Of the approximately 55,700 residents of Monroe County, 87% live outside the Grade B contour of the nearest broadcast stations. The Key Largo community, in which approximately five percent of the County's residents live, can receive Grade B service from the five Miami television stations. The Upper Keys region of the County, where an additional eight percent of the population lives, can receive only the Miami independent station, WCIX. J.A. 39-40
 The cable company has approximately 15,800 subscribers, which figure amounts to about 85% of the homes in Key West and Marathon, the two communities it serves to any substantial degree. J.A. 164-65. Presumably the percentage of all homes in the County that receive cable is lower.
 
 
 [56]
 47 U.S.C. Sec. 151 provides that the FCC's power to regulate communications was created "so as to make [communications service] available, so far as possible, to all the people of the United States." (Emphasis added.) See supra note 45. See also C.J. Community Servs. v. FCC, 246 F.2d 660, 663 (D.C.Cir.1957) ("it is the clear duty of the Commission to devise ... the basis upon which 'all the people of the United States' may receive service through a licensed station")
 
 
 [57]
 See Low-Power TV Rules, 45 Fed.Reg. 69,178, 69,178 p 1 (1980) (notice of proposed rulemaking) ("Through the rule changes proposed [to allow origination by low-power television stations] we hope to bring television service to locations that otherwise are unserved or underserved ... by regular, full service television stations and by cable services." (footnote omitted)); id. at 69,179-81 paragraphs 9-21 (history of translator development); Notice of Inquiry, supra note 3, at 1541-49 (same); VHF Television Translator Amendments, 25 Fed.Reg. 7317, 7317 (1960) (Commission's concern "with the problem of bringing television service to all sectors of the nation")
 
 
 [58]
 There is, moreover, evidence in the record of public demand for the proposed service. The 1973 decision by the elected Board of County Commissioners to seek the translator permits at issue here was unanimous. J.A. 292-93. Since then, more than 4,000 County citizens have voiced support for the translators through petitions and letters. J.A. 773-74
 
 
 [59]
 One translator unit was needed for each of the five Miami television stations that the County sought to rebroadcast, and five translators were needed to bring each signal to the various parts of the County to be served
 Tele-Media did not object to this finding except as to some of the translators closest to Miami, which it argued were not needed since they would serve individuals who are within the Grade B contours of the Miami stations to be rebroadcast. See J.A. 196-97. The Commission found that there was a need for these translators as well because their signals will be substantially stronger than those now available and will provide service to areas presently beyond the Grade B contours of all but one of the Miami stations. 72 F.C.C.2d at 687-88. These findings were supported by substantial evidence.
 
 
 [60]
 See KTVB, Inc., 56 F.C.C.2d 895, 897 (1975); Northfork TV Translator System, 54 F.C.C.2d 246, 247 (1975); Platte Valley Farm Supply Co., 30 F.C.C.2d 435, 437-38 (1971)
 
 
 [61]
 Specifically, the Commission stated:
 We recognize that there are translator applications on file now, awaiting Commission action, and that applications will be filed on a continuing basis during the pendency of this proceeding. We can anticipate that this proceeding will continue over an extended period, although various intermediate actions may be taken throughout the period. We deem it inappropriate to delay the authorization of new TV translators under the existing plan of regulation during that period. The needs of the viewing public, particularly in the rural areas where most translators are located, are more important than any administrative convenience which might result from a general "freeze" on translator applications. Consequently, the Commission's staff will routinely accept and process all translator applications during the pendency of this inquiry. With respect to those applications requiring rule waivers or embodying novel features touching upon matters being considered herein, the Commission will examine such applications and take such action as it deems appropriate--action which may include the holding of particular applications in abeyance pending resolution of the issues herein.
 Notice of Inquiry, supra note 3, at 1535.
 
 
 [62]
 As it turned out, the rulemaking did not significantly touch on the issues raised by Tele-Media in this case. See Low-Power TV Rules, 47 Fed.Reg. 21,468 (1982) (final rules), as corrected, 47 Fed.Reg. 30,495 (1982). Rather, the rulemaking dealt entirely with permitting low-power television stations to originate broadcasting, an issue not directly relevant here since the County does not even seek to include origination equipment in its translators, see J.A. 39
 The Notice of Inquiry that initiated the rulemaking could be interpreted as seeking comments on two issues raised here: the Carroll issue, see Notice of Inquiry, supra note 3, at 1533-34, and the question of the County's need to own all 25 translators, see id. at 1534. Ultimately, however, the Commission discussed these issues in the somewhat different context of program origination by low-power television, rather than in the context of translators. As to the Carroll issue, the Commission concluded that few low-power television stations would be able to garner enough audience and advertisers from broadcast stations so as to result in a net loss in public service programming. Low-Power TV Rules, supra, at 21,483-84. The Commission added that its holding in the decision under review that Carroll should not apply to the local programming produced by cable systems was "consistent with this belief and with the record adduced in the instant proceeding." Id. at 21,484. This suggestion is not directly relevant to translators because low-power television can originate programming to replace any decrease in local programming by cable stations, while translators cannot. As to the ownership question, the Commission extended to low-power television stations the provision allowing multiple ownership without a showing of need. Id. at 21,487-89, 21,499 (Sec. 74.732(b)); see supra note 54.